LaMonica Herbst & Maniscalco, LLP
3305 Jerusalem Avenue, Suite 201
Wantagh, New York 11793
Salvatore LaMonica, Esq.
Jacqulyn S. Giunta, Esq.

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re:

Jude Thaddeus Partners I, Inc.                        Chapter 11
                                                      Case No. 10-73014-ast

                          Debtor.
------------------------------------------------------------x

### MOTION BY BMR FUNDING LLC SEEKING THE ENTRY OF AN ORDER, PURSUANT TO 11 U.S.C. § 362(d), (e) & (g), FOR RELIEF FROM THE AUTOMATIC STAY; OR, IN THE ALTERNATIVE, PURSUANT TO 11 U.S.C. §1112(b) DISMISSING THE DEBTOR'S CASE

BMR Funding LLC ("BMR"), the successor-in-interest to and assignee of SPCP Group, LLC ("SPCP"), the successor-in-interest to and assignee of BLX Capital LLC ("BLX"), by and through its counsel, LaMonica Herbst & Maniscalco, LLP, submits this motion (the "Motion") for the entry of an Order: (i)  pursuant to §362 of Title 11 of the United States Code (the "Bankruptcy Code") granting relief from the automatic stay to permit BMR to exercise its contractual and legal remedies against its borrower and (original) mortgagor of its commercial loan, JJF Garage, Inc. d/b/a Steamboat Landing ("JJF") and the real property known as and located at 76 Shore Road a/k/a 74 Shore Road, Glen Cove, New York (the "Property");  or, in the alternative, (ii) pursuant to Bankruptcy Code §1112(b) dismissing the Debtor's bankruptcy case because of the Debtor's bad faith filing of the instant chapter 11 proceeding respectfully sets forth and states as follows:

## PRELIMINARY STATEMENT

The instant chapter 11 proceeding is another step in the scheme to prevent BMR from foreclosing its interest against the Property orchestrated by JJF, John Ferrara ("Ferrara") and John Weiser ("Weiser"), the common principal of the Debtor and its affiliate, The Wharf at Thaddeus Landing Inc. (The "Tenant"). [1]  The Tenant remains in possession of the Property pursuant to a below market "sweetheart" lease for $1,000 per week.  As a result, the Tenant, under the dominion and control of Weiser, has continued to realize enormous profits from the operation of the Property while absolutely no debt service has been remitted to BMR (or its predecessors) in almost three (3) years.[2]  This Debtor is an entity that BMR didn't even know existed and didn't know held title to the Property until after the instant chapter 11 case was filed.[3]  Simply put, this Debtor seeks to abuse the Bankruptcy Code by its instant chapter 11 filing while it's affiliated entity having common ownership and control, the Tenant, remains in "possession" of the Property and operates an ostensibly profitable restaurant all to BMR's detriment.

On the eve of the foreclosure sale of the Property, the Debtor filed for bankruptcy relief. This transfer is nothing more than another calculated and intentional act in a series of transactions by and among Weiser and Ferrara, the principals of the Debtor and Tenant, and JJF,

---

[1] The Debtor's President and 100% shareholder is an individual named Joseph Weiser. Worth noting, Joseph Weiser is also the President shareholder of the Tenant.

[2] BMR first learned of the existence of the "sweetheart" lease well after the receivership order was entered by the Supreme Court, Nassau County, in or around July 17, 2009 when the Tenant sought removal of the receiver.

[3] JJF, as mortgagor/landlord of the Property, and the Tenant entered into a lease in or about February 2008, notwithstanding the fact that neither BMR nor its predecessors-in-interest consented to the lease (as is a condition precedent under the relevant first and second mortgages between JJF and BMR), which consent would have been withheld given its economic terms are a mere $4,000 per month in "rent".

2

evidencing the "fast and loose" play of these parties in connection with the pending foreclosure action.  Indeed, BMR and its predecessors lack any privity whatsoever with the Debtor under the Loan Documents (as defined herein) and the Debtor is not and has never been, an obligor of BMR and its predecessors under the Loan Documents.  Based upon the foregoing, BMR submits that the instant proceeding was commenced by the Debtor with the sole purpose of delaying the inevitable foreclosure of the Property with no realistic hope of reorganizing and therefore it was filed in "bad faith".

BMR now seeks relief from the automatic stay pursuant to Bankruptcy Code §362(d)(2) & (1) on the basis that: (a)(i) the Debtor lacks equity in the Property and (ii) the Property is not necessary for an effective reorganization because there is no reasonable prospect for a successful reorganization in this chapter 11 proceeding; and (b) BMR's interest in the Property is not and cannot be adequately protected.  In the alternative, BMR respectfully requests the Court dismiss the Debtor's bankruptcy case, pursuant to Bankruptcy Code §1126(b) based on the objective evidence that the Debtor filed its case in bad faith on the day before the foreclosure sale of the Property and that this proceeding is nothing more than a two party dispute that should not be before this Court.

## JURISDICTION, VENUE AND STATUTORY PREDICATE

1.      This Court has jurisdiction over the administered bankruptcy case pursuant to 28 U.S.C. §§157 & 1334 and venue is proper pursuant to 28 U.S.C. §§1408 & 1409.

2.      This is a "core" proceeding pursuant to 28 U.S.C. §§157(b)(2)(A) & (O) and the statutory predicates for the relief sought herein are Bankruptcy Code §362(d)(1), (d)(2), (e) & (g).

## Factual Background

3.    On April 26, 2010 (the "Filing Date"), the day before the scheduled foreclosure sale of the Property, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with this Court.

4.    The Debtor has remained in possession of its assets and in the management of its affairs in accordance with Bankruptcy Code §§1107 & 1108.

5.    Upon information and belief, no official committee of unsecured creditors and no trustee or examiner has been appointed in this proceeding.

6.    The real property at issue herein is located 76 Shore Road a/k/a 74 Shore Road, Glen Cove, New York.

### *The First Loan*

7.    On or about February 26, 2003, BLX, at the request of JJF, made a loan (the "First Loan") to JJF the principal sum of one million three hundred thirty three thousand dollars ($1,333,000.00).    In connection with the First Loan, JJF executed in favor of and delivered to BLX a first note in the principal amount of one million three hundred thirty three thousand dollars ($1,333,000.00) (the "First Note").    A copy of the First Note is annexed hereto as Exhibit "A".    The First Note is secured by, among other things, a first-priority mortgage dated February 26, 2003 on the Property for the principal amount under the First Note, executed by JJF, in favor of BLX (the "First Mortgage").    The First Mortgage was recorded on March 13, 2003 in the Office of the Clerk of Nassau County.    A copy of the First Mortgage is annexed hereto as Exhibit "B".

8.     As further security for the First Note, John Ferrara, Joseph Ferrara and Maria Ferrara (collectively, the "Ferraras") each executed and delivered to BLX a guaranty dated February 26, 2003 (collectively, the "First Loan Guaranties"), thereby unconditionally guaranteeing to BLX, JJF's obligation under the First Note.

9.     The First Note is further secured by a Security Agreement dated February 26, 2003 (the "First Security Agreement") wherein JJF granted BLX a security interest in all machinery, equipment, motor vehicles, accounts, accounts receivable, inventory and general intangibles, and all proceeds therefrom.  BLX filed a UCC-1 financing statement on February 10, 2003 with the Secretary of State of the State of New York and thus, perfected its security interest in all of the personal property of JJF.

10.     On or about September 21, 2007, BLX assigned the First Note, the First Mortgage, the First Security Agreement and the First Loan Guaranties (each of the foregoing, collectively the "First Loan Documents") to SPCP.  The assignment was recorded in the Office of the Clerk of Nassau County on November 12, 2007.  At that time, SPCP became the successor-in-interest to and assignee of BLX and holder of the First Loan Documents.

11.     Thereafter on January 26, 2009, SPCP assigned the First Loan Documents to BMR and BMR became the successor-in-interest to SPCP and is the current secured party under and holder of, the First Loan Documents.

### *The Second Loan*

12.     On or about February 26, 2003, BLX, at the request of JJF, made a second loan (the "Second Loan" and together with the First Loan, collectively, the "Loans") to JJF in the principal sum of four hundred thousand dollars ($400,000.00).  In connection with the Second Loan, JJF executed in favor of and delivered to BLX a Second Note in the principal amount of

four hundred thousand dollars ($400,000.00) (the "Second Note").  A copy of the Second Note is annexed as Exhibit "C".  The Second Note is secured by, among other things, a second-priority mortgage dated February 26, 2003 securing the Property for the principal amount under the Second Note, executed by JJF, in favor of BLX (the "Second Mortgage").  The Second Mortgage was recorded on March 13, 2003 in the Office of the Clerk of Nassau County.  A copy of the Second Mortgage is annexed hereto as Exhibit "D".

13.    As further security for the Second Note, the Ferraras executed and delivered to BLX a guaranty (the "Second Loan Guaranty") dated February 26, 2003, thereby unconditionally guaranteeing to BLX, JJF's obligation under the Second Note.

14.    The Second Note is further secured by a Security Agreement dated February 26, 2003 (the "Second Security Agreement") wherein JJF granted BLX a security interest in all machinery, equipment, motor vehicles, accounts, accounts receivable, inventory and general intangibles, and all proceeds therefrom.  BLX filed a UCC-1 financing statement on February 10, 2003 with the Secretary of State of the State of New York and thus, perfected its security interest.

15.    On or about September 21, 2007, BLX assigned the Second Note, the Second Mortgage, the Second Security Agreement and the Second Loan Guaranty (each of the foregoing, collectively, the "Second Loan Documents" and together with the First Loan Documents, collectively, the "Loan Documents") to SPCP and the assignment was recorded in the Office of the Clerk of Nassau County on November 12, 2007. At that time, SPCP became the successor-in-interest to and assignee of BLX and holder of the Second Loan Documents.

16.    On January 26, 2009, SPCP assigned the Second Loan Documents to BMR and BMR became the successor-in-interest to and assignee of SPCP and is the current secured party and holder of the Second Loan Documents.

### *The Foreclosure Action*

17.    Shortly after the assignment of the Loan Documents to SPCP, JJF defaulted on its obligations under the Loans as a result of, among other things, its failure to pay when due, certain debt service and outstanding real estate taxes.

18.    On or about January 7, 2008 SPCP declared JJF and the Ferraras in default of their obligations under the Loan Documents, accelerated the amounts due thereunder and commenced the foreclosure action under the Second Loan Documents in the Supreme Court of Nassau County captioned: SPCP, Group L.L.C., as successor-in-interest to BLX Capital, L.L.C. v. JJF d/b/a Steamboat Landing, John Ferrara, Joseph Ferrara, Maria Ferrara *et al.*, under Index No. 00309/08 (the "Foreclosure Action").

19.    Shortly after the commencement of the Foreclosure Action, JJF voluntarily entered into a written, one-page "sweetheart" lease, dated February 28, 2008 (the "Lease") with the Tenant, an entity owned and/or controlled by Weiser and Ferrara, whereby the Tenant agreed to "rent" the Property and manage the restaurant located therein, for a three year term for $1,000 per week.[4] A copy of the Lease is annexed hereto as Exhibit "E".  The rental obligation from the Tenant pursuant to this Lease was allegedly JJF's only source of income from the Property,

---

[4]  BMR's predecessor, SPCP, first learned of the existence of the Lease in July 2009.  Notably, and as further indicia of the pattern and practice involving rampant fraud and deceit by the Debtor, Tenant, JJF and their principals, the Debtor's proposed counsel has also appeared on behalf of and is currently representing the Tenant in ongoing proceedings against the receiver in the Foreclosure Action.  Further, as recently as April 2010, Debtor's proposed counsel commenced a new state court action on behalf of the Tenant, as plaintiff, against SPCP, its counsel in connection with the Foreclosure Action and SPCP's asset manager consultant, as defendants, for alleged "damages" incurred by the Tenant as a result of the court-appointed receiver.  As admitted by the Debtor in its schedules, Weiser is the present and 100% shareholder of the Debtor. Weiser is also president and shareholder of the Tenant.

notwithstanding the fact that the Loans to JJF were originated for purposes of JJF acquiring the Property furniture, fixtures, machinery and equipment necessary to run and operate the restaurant.

20.      The Defendants in the Foreclosure Action -- the ones in privity with SPCP under the relevant Loan Documents -- failed to respond to SPCP's motion for a judgment of foreclosure and in fact, since the date of commencement of the Foreclosure Action to date, have never appeared, answered or otherwise moved at any time whatsoever in connection with the Foreclosure Action or relief sought by BMR or its predecessors.  Accordingly, in an Order dated January 20, 2010, SPCP's unopposed motion for a judgment of foreclosure, confirmation of the referee's report and an award for counsel fees and cost was granted.   The Judgment of Foreclosure was entered by the Nassau County clerk on March 5, 2010 (the "Judgment").  A copy of the Judgment is annexed as Exhibit "F".

21.      During the course of the Foreclosure Action, the State Court also granted SPCP's request to appoint a receiver to, among other things, preserve and protect the Property, collect the rental obligations and operate the Property while SPCP continued its Foreclosure Action of the Property.   At no time whatsoever during the State Court litigation in connection with the Foreclosure Action did the Tenant, Weiser or their attorneys disclose to the State Court or SPCP that an affiliated entity, the Debtor, became the record owner of the Property in October 2008. As we now learn, the Tenant and Weiser in sworn affidavits unequivocally made statements to the contrary and instead, produced the "sham" Lease to the State Court as purported evidence of it being an "innocent" third party in connection with an "arm's length" lease transaction between the Tenant and JJF.

22.     While this pattern and practice of fraud and deceit continued, on July 21, 2009 and February 9, 2010, on behalf of its mortgagor JJF, BMR made advances under the Loan Documents in the amount of $51,576.03 and $25,361.47, respectively, for unpaid real property taxes and tax liens against the Property for the years, 2006, 2007, 2008 and 2009, respectively, in an effort to prevent the-foreclosure of the Property by the tax lien holders.

23.     After the commencement of the Foreclosure Action and unbeknownst to SPCP, by deed dated October 17, 2008 (the "Deed"), JJF transferred title to the Property to the Debtor. The Tenant took possession of the Property to place a "layer" between the secured lender and its mortgagor under its "sweetheart" Lease with full knowledge of the pending Foreclosure Action. Similarly, the Debtor took title to the Property with full and complete knowledge and notice of the pending Foreclosure Action.  A copy of the Deed is annexed as Exhibit "G".

24.     At no time whatsoever during any of the State Court proceedings between the Tenant, SPCP and the receiver, did the Tenant, its principals or attorneys advise the State Court of what essentially is tantamount to a "shell game" involving affiliated common ownership entities among JJF, the Debtor and Tenant.  To the contrary, the Tenant (and its counsel) intentionally withheld such information from the State Court.

25.     The Deed indicates consideration exchanged in the amount of $2,023,153.67, none of which was paid to SPCP pursuant to pursuant to the "due on sale" clauses in the Mortgages.  Indeed, SPCP did not consent to any such transfer of the Property from its mortgagor, JJF, as it never knew about it until after the Filing Date.

26.     After the entry of the Judgment, SPCP scheduled a foreclosure sale for April 27, 2010 (the "Foreclosure Sale").

27.     On the eve of the Foreclosure Sale, the Debtor, as purported record owner of the Property, filed the instant bankruptcy proceeding and the Foreclosure Sale was automatically stayed.  According to the Debtor's schedules filed with this Court, the Property is the Debtor's only tangible asset.  As mentioned above, and confirmed in Schedule G, the Debtor's only source of income is the rental obligation under the "sweetheart" Lease with its affiliate, the Tenant.  On Schedule F, the Debtor lists only two other creditors with unsecured claim thereby making this a two-party, single asset case.  The total amount of the unsecured debt listed on the Debtor's schedules is a mere $6,900.00.

28.     In Schedule B, the Debtor states that the value of the Property is $1.4 million, well below amounts owed under the Mortgages.  Currently, the Property is encumbered by the First and Second Mortgages with an outstanding balance of almost $2.0 million.  Under the terms of the First Loan, there remains a balance of $1,489,593.92.  In addition, under the terms of the Second Loan, there remains a balance of $491,097.94.  If the current Lease remains in place and there are no defaults in rental payments, the anticipated rent collection over the next 12 month period will yield a gross rental income of $52,000.  Clearly, the Debtor's expected income from the sham "Lease" is insufficient to repay the outstanding obligations to BMR under the Loans.

29.     Most importantly, the prospect of the Debtor's successful reorganization is objectively futile.  There is no equity in the Debtor's Property as admitted by the Debtor in Schedule B.  In fact, under the best scenario, BMR will have an unsecured deficiency claim, which will exceed one-third of the allowed unsecured claims against the Debtor's estate and constitute a blocking position pursuant to Bankruptcy Code §1126(c).  The rental income from the Lease is nominal when compared to the location and value of the Property.  The Debtor

admits that the value of the Property is approximately $1.4 million dollars, and allows its Tenant-affiliate, which is under common ownership and control, to operate a lucrative restaurant at the Property and pay a mere approximately $4,000.00 a month.  Thus, the objective evidence provided by the Debtor establishes that the Debtor does not have the wherewithal to fund a plan of reorganization that has even the slightest chance of being confirmed by this Court.  Moreover, given the minimal income realized from the Tenant, the Debtor is incapable of providing any meaningful adequate protection to BMR.

30.     Based upon the foregoing, it is evident that this chapter 11 proceeding is nothing more than a continuing attempt by the principals of the Debtor, Tenant and JJF to wrongfully deprive BMR from realizing on its collateral while the affiliated Tenant reaps profits from its wrongful operation of the Property.  Indeed, this Debtor is not a party to the Loan Documents and lacks any privity with the lender thereunder, has no realistic hope of reorganizing and is wrongfully using this Court, and abusing the protections afforded by the Bankruptcy Code, to "buy time" for its affiliate to continue in wrongful possession of the Property, continue and perpetuate this "shell game" and realize the profits from the Property constituting BMR's collateral.

## BASIS FOR THE RELIEF REQUESTED

31.     BMR requests that the Court enter an Order pursuant to Bankruptcy Code §362 (d)(1) & (2) vacating the automatic stay to permit BMR to exercise all of its rights and remedies with respect to the Property under the First and Second Mortgage and applicable non-bankruptcy law. The automatic stay is "not to remain in place indefinitely," and this Court has the power to grant relief from the automatic stay under appropriate circumstances. *See, e.g., In re Colin,*

*Hochtsin Co .,* 41 B.R. 322,325 (Bankr. S.D.N.Y. 1984).  Or, in the alternative, pursuant to

Bankruptcy Code §1112(b), BMR requests that the Court enter an Order dismissing the Debtor's

case because the Debtor filed in the case in "bad faith".

### *The Debtor Lacks Equity in the Property and Such Property is not necessary for an Effective Reorganization*

32.     BMR is entitled to relief from the automatic stay under Bankruptcy Code §362

(d)(2) because the Debtor lacks equity in the Property and such Property is not necessary for an

effective reorganization because no such reorganization is feasible.

33.     Bankruptcy Code §362(d)(2) provides:

on the request of a party in interest and after notice and a hearing, the court shall grant

relief from the stay provided under subsection (a) of this section, such as by terminating,

annulling, modifying, or conditioning such stay –

. . .

(2) with respect to a stay of an act against property under subsection (a) of this section, if

 (A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

11 U.S.C. §362(d).

34.     The classic test for determining equity under Bankruptcy Code §362(d)(2) focuses

on the "difference between property value and the total amount of liens against it." *In re New*

*Era Company,* 125 B.R. 725, 728 (S.D.N.Y. 1991) *citing In re 6200 Ridge Inc.,* 69 B.R. 837, 842

(Bankr. E.D.Pa. 1987).   Legislative history shows that Bankruptcy Code §362(d)(2) was

intended to protect a creditor's right to foreclose. *In re Indian Palms Assoc., Ltd,* 61 .3d 197,207

(3d Cir. 1995).   Because the Debtor took title to the Property subject to the First and Second

Mortgage, which is greater than the value of the Property, the Debtor has no equity in the

Property.  Once it is demonstrated that a debtor has no equity in the subject property, relief from the stay must be granted unless the debtor proves that such property is necessary for an effective reorganization. *United Sav. Ass 'n of Texas* v. *Timbers of Inwood Forest Assoc.,* 484 U.S. 365,375-76 (U.S. 1998).

35.     As mentioned above, the current value of the Property is estimated by the Debtor in its schedules to have a fair market value of approximately $1.4 million, which is almost $600,000.00 less than the aggregate amounts owed to BMR on the First and Second Mortgage. Therefore, the Debtor has no equity in the Property because the BMR's liens in the aggregate principal amount of $2.0 million far exceeds the value of the Property.  Under the highest possible valuation of the Property, the Debtor has no ability to achieve a successful reorganization.

36.     Under Bankruptcy Code §362(g), the Debtor has the burden of proof that the collateral is necessary to effect reorganization.  Moreover, in *Timbers*, the Supreme Court expounded on this requirement in that a reorganization plan cannot just be conceivable "but that the property is essential for an effective reorganization *that is in prospect.* This means, as many lower courts, including the en banc court in this case, have properly said, that there must be 'a reasonable possibility of a successful reorganization within a reasonable time'." *United Sav. Ass 'n of Texas* v. *Timbers of Inwood Forest Assoc.,* 484 U.S. at 377 *citing* 808 F.2d, at 370-371, and nn. 12-13  and cases cited therein.; *see In re Pegasus Agency,* 101 F.3d 882,886 (2d Cir. 1996) (Once it is demonstrated that the debtor has no equity in the subject property, relief from the stay must be granted unless the debtor proves that such relief is necessary for an effective reorganization).

37.     The Debtor cannot establish that the Property is necessary for an effective reorganization since the Debtor has no prospect of an effective reorganization.  Reorganization is not feasible for the Debtor, let alone "in prospect".   First, the Debtor does not hold any unencumbered interest in the Property or other assets. The Property is currently occupied by an affiliate of the Debtor under a below market Lease, and there is little or no income being generated by the Property.   Thus, the Debtor has no collateral to support additional financing necessary to stabilize the Property or to fund its reorganization.

38.     Second, pursuant to Bankruptcy Code §506(a)(1), BMR has a secured claim in an amount equal to the value of the Property and a potential enormous unsecured claim for the deficiency.  Based on the appraised value of the Property, BMR has a potential deficiency claim of approximately $600,000.00.  According to Schedule F, there are only two other creditors with unsecured claims totaling $6,900.00.  Given that there are no other assets other than the Property, it is certain that the unsecured deficiency claim of BMR will the exceed one-third of the allowed unsecured claims against the Debtor's estate and thus, constitute a blocking position pursuant to Bankruptcy Code §1126(c).   Accordingly, the Debtor cannot confirm a plan without BMR's consent, which will not be forthcoming under the circumstances. The Debtor therefore will not be able to satisfy the Bankruptcy Code §1129(a)(10) requirement that at least one impaired class accept the plan without regard to the votes of insiders.

39.     Finally, the Debtor lacks the cash resources to pay administrative and priority claims, a requirement for confirmation of a plan under Bankruptcy Code §1129(a)(9).  As set forth above, the Debtor's only source of income derives from the rental obligation of approximately $4,000.00 a month under the current Lease with the Tenant.  BMR has established

that the Debtor income is nominal in comparison to the amount of debt owed under the First and Second Loan and thus, has no prospects throughout the reorganization.

***Cause Exists to Lift the Automatic Stay***

40.     Additionally, BMR submits that "cause" exists to lift the automatic stay and permit BMR to exercise its rights with respect to its collateral.  Pursuant to Bankruptcy Code §362(d)(I), upon notice and a hearing, a court may lift the automatic stay for "cause, including the lack of adequate protection."  The decision of whether to lift the stay for "cause" under Bankruptcy Code §362(d) is committed to the sound discretion of the bankruptcy court and is reviewed for abuse of discretion. *In re* C & S *Grain Co.,* 298 B.R. 222, 225 (D. Del. 2003).

41.     The Debtor cannot adequately protect BMR's interest in the Property.  According to the Bankruptcy Code, adequate protection can be provided by anyone of the following non-exclusive methods: "(1) cash payment or periodic cash payments to such entity… to the extent that the stay ... results in a decrease in the value of such entity's interest in such property; (2) providing to such entity an additional or replacement lien ... or (3) ... the indubitable equivalent of such entity's interest in such property." 11 U.S.C. §361.

42.     The Debtor has not provided BMR with cash payments or any other form of adequate protection contemplated by Bankruptcy Code §361 to preserve the value of BMR's interest in the Property or its other collateral, and, according to its own schedules, it does not have the ability to do so.  Without adequate protection, maintenance of the stay is causing BMR's collateral to decrease in value. There is a substantial threat that the Property's value will further deteriorate since the Debtor is insufficiently funded to maintain the Property.  Once again, there sole income from the Lease is insufficient to provide the BMR with a proper amount of adequate protection as require under the Bankruptcy Code §361.

## *Cause for a Dismissal of the Debtor's Bankruptcy Case*

43.    Cause for either dismissal or relief from the stay, may be found based upon enumerated factors including "Bad faith" or failure to deal with creditors fairly even where bad faith is not found. *In re Éclair Bakery, Ltd.*, 255 B.R. 121, 138 (Bankr. S.D.N.Y.) *citing In re C-TC 9th Ave. Partnership*, 131 F.3d 1304, 1310 (2d Cir. 1997) and *In re Head*, 223 B.R. 648, 653 (Bankr. W.D.N.Y. 1998).

44.    Indeed, Courts have established bad faith by identifying a technique referred to as the "New Debtor Syndrome". *See In re Kinney*, 51 B.R. 840, 841 (Bankr. C.D.Cal. 1985).  The characteristics of New Debtor Syndrome have been described as follows:

> Formation of a new entity for the purpose of filing a bankruptcy petition; foreclosure in threatening with respect to the assets in question; the only creditors affected are those threatening foreclosures; few, if any, unsecured creditors and no other creditors pressure; no ongoing operations or employees other than the controlling participants; no cash flow; the primary function of the debtor is to resist foreclosure as to the isolated assets held by the new debtors.

[5 Norton Bankr. L. & Prac., 3d, § 103.23 ].  *See In re Schmitt Farm Partnership*, 161 B.R. 429 (N.D. Ill. 1993) (court recognizes "new debtor syndrome" whereby debtor transfers certain of its assets prior to the filing of its bankruptcy petition as separate grounds for relief from stay). *See also In re Laguna Associates Ltd. Partnership*, 30 F.3d 734, 25 Bankr. Ct. Dec. (CRR) 1492, 31 Collier Bankr. Cas. 2d (MB) 545, Bankr. L. Rep. (CCH) P 75997, 1994 FED App. 0270P (6th Cir. 1994), as amended on denial of reh'g and reh'g en banc, (Sept. 9, 1994) (bad-faith case; court emphasizes creation of new corporation just prior to bankruptcy); *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, Bankr. L. Rep. (CCH) P 72355 (11th Cir. 1988) (court dismissed petition for lack of good faith).

45.    Further, many courts have identified "badges of bad faith" as grounds to dismiss improperly filed bankruptcy petitions. *See In re Consulting Actuarial Partners*, 72 B.R. 821, 826 (Bankr. S.D.N.Y. 1987); *In re Pleasant Pointe Apartments*, 139 B.R. 828, 832 (Bankr. W.D. Ky. 1992); *In re Ravick Corp.*, 106 B.R. 834, 842 (D.N.J. 1989). A list of these "badges of bad faith" identified in the cases above are as follows:

(1) The debtor has only one asset;

(2) The transfer of distressed real property into a newly created or dormant entity, usually a partnership or corporation;

(3) The transfer occurring within close proximity to the filing of the bankruptcy case;

(4) No consideration being paid for the transferred property other than stock in the debtor;

(5) The debtor having no assets other than the recently transferred, distressed property;

(6) The debtor has no cash flow;

(7) The debtor having no or minimal unsecured debts;

(8) The debtor having no employees and no ongoing business;

(9) The debtor having no means, other than the transferred property, to service the debt on the property; and

(10) The debtor's financial issues are, in essence, a two party dispute.

46.    Once a creditor establishes that the transfer of the distressed property to the debtor was in "close proximity" to the filing of the case, a *prima facie* showing of bad faith has been shown, this creating a rebuttable presumption of bad faith. *In re Yukon Enterprises, Inc.*, 39 B.R. 919, 921 (Bankr. C.D.Cal. 1984); accord, *In re Éclair, supra.*, 255 B.R. at 140.  The burden then shifts to the debtor to establish good cause and sufficient reasons why the relief should not be granted. *Id.*

47.     In "single-asset" real estate cases, the United States District Court for the Eastern District in New York opined that where there is a pending state court foreclosure action; one must consider two important factors to determine if the Debtor filed the petition in good faith. The factors are "1) the hope of rehabilitation, and 2) can the dispute be resolved in the pending State Court action?" *In re 9281 Shore Road Owners Corp.*, 187 B.R. 837, 848 (E.D.N.Y. 1995).

48.     The Debtor and its attorney clearly filed this bankruptcy case in bad faith.[5]  As the facts above make clear, the Loan Documents were between JJF, the Ferraras and BMR', as successor-in-interest. The Ferraras personally guaranteed and committed to the repayment of the Loans pursuant to the terms of the Loan Documents.  It was only after JJF defaulted under the terms of both Loans and SPCP commenced the Foreclosure Action that JJF sold 51% of the corporate stock in JJF to Weiser, entered into the "sham" Lease and transferred title to the Property to the Debtor.  During the pendency of the Foreclosure Action involving the receivership litigation, the Tenant, Weiser and its counsel intentionally withheld information regarding the affiliated Debtor's ownership interest in the Property, Weiser's ownership interest in JJF and what is now a patent common ownership and control between Tenant and Debtor. Then, on the eve of the Foreclosure Sale, the Debtor filed for bankruptcy relief.  Although the Debtor was never party to the Loans, the Loan Documents and the Foreclosure Action, the Debtor now seeks relief from this Court by invoking the protections under the Bankruptcy Code.

49.     Specifically, at the time the parties entered into the Loan Documents, Ferrara was the majority, if not sole, shareholder of JJF.  After the Loans originated and eight months prior to the transfer of title to the Debtor, Ferrara transferred 51% of the corporate shares in JJF to Weiser in a letter agreement dated February 21, 2008.  A copy of the letter agreement is annexed

---

[5] As a result of the voluntary and intentional acts of the principal of the Debtor (and Tenant) stated herein, BMR specifically reserves the right and intends to seek sanctions against counsel to the Debtor (and Tenant).

as Exhibit "H".  Weiser, as President of the Debtor, is also the signatory on the bankruptcy petition.  Weiser was the controlling shareholder of JJF when in February 2008, JJF entered into the Lease with the Tenant, an entity owned and controlled by Weiser.  Similarly, Weiser was the controlling shareholder of JJF when in October 2008, JJF effectively transferred title to the Property to the Debtor, an entity Weiser is President of and owns and controls.   In effect, control over the Property has not changed through the transfer of title.  Moreover, just seven days after buying the majority shares of JJF, Weiser was the signatory on behalf the Tenant entering into the "sweetheart" Lease with JJF.  Since it purchased a majority shareholder position in JJF, Weiser has controlled the Property as title owner and operated the Property through the Tenant in an effort to thwart the secured lender's recovery therefrom.  Weiser and its counsel intentionally failed to advise the State Court during the pending Foreclosure Action that Weiser was affiliated with JFF, that Ferrara was affiliated with the Tenant[6] and that the Property was transferred from JJF to Debtor.

50.    Weiser, while in control of JJF (and Tenant), intentionally and fraudulently transferred the Property into the Debtor, a newly created or dormant entity which he owned and controlled.  Moreover, the Debtor is: (i) an entity that has no other assets other than the recently transferred, distressed Property; (ii) no cash flow (other than the "rents" under the "sham" Lease; (iii) no unsecured creditors (other than two which are *de minimis*) (iv) and the Debtor's financial issues and this case are, in essence, a two party dispute.  Weiser's actions were simply to either avoid the imminent foreclosure of the Property, force the lender into selling the Property to Weiser after it became the owner through foreclosure at a substantial discount, sell the Loan Documents to Weiser at a substantial discount and to perpetuate the existing fraud and deceit.

---

[6] The New York State Liquor Authority listed Ferrara and Weiser as principals of Tenant in connection with the liquor license operated at the Property.

51.     Consequently, Debtor displays many, if not all, of the "badges of bad faith" and symptoms of New Debtor Syndrome. The Debtor reports no cash flow, no bank accounts, no other business activity and the Lease from the Tenant as the only asset. This two-party dispute has only one goal—depriving BMR's of its right to foreclose upon the Property.

52.     Moreover, in proceeding that involved a two-party dispute pending in state court, the District Court in the Eastern District of New York, denied the Debtor's motion for reconsideration and affirmed the Bankruptcy Court's decision to dismiss two Chapter 11 cases because the Debtor filed the petitions in bad faith.   The Bankruptcy Court held that "a[n] interdiction against refiling was considered necessary and appropriate by this Court because the First chapter 11 Case was commenced not to reorganize, restructure or rehabilitee, but to impermissibly use Chapter 11 as a weapon in a **two-party dispute**. *In re Bridge to Life, Inc.*, 2006 WL 1329778 (E.D.N.Y. 2006) *quoting In re The Bridge to Life, Inc.*, 330 B.R. 351, 354 (Bankr. E.D.N.Y. 2005).

53.     This case clearly involves a two-party dispute and should not be litigated in the Bankruptcy Court.  The Debtor evaded foreclosure on the Property by the filing one day prior to the Foreclosure Sale.  This specific dispute was litigated and resolved in State Court.  BMR successfully obtained a Judgment to foreclose on the Property and made all the necessary arrangements to hold a public auction.  This was the Debtor's final attempt to stall the process, despite the fact that the Debtor has no intention of reorganizing and is using this proceeding as a stall tactic.

**WHEREFORE**, for all the foregoing reasons, BMR respectfully requests that the Court grant BMR relief from the automatic stay to exercise its rights with respect to its collateral and proceed with the foreclosure; or, in the alternative, dismiss the Debtor's bankruptcy case and grant such other relief as is appropriate.

Dated: May 26, 2010
      Wantagh, New York

                                         **LaMonica Herbst & Maniscalco, LLP**
                                         Attorneys for BMR Funding, LLC

By:      *s/ Salvatore LaMonica*
              Salvatore LaMonica, Esq.
              A Member of the Firm
              3305 Jerusalem Avenue, Suite 201
              Wantagh, New York 11793
              Phone No. 516.826.6500